THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* MANUEL DUEÑO MAYSONET, Defendant and Appellant.

No. CR-66-19.      Decided June 13, 1967.

*Olga Cruz Jiménez, José L. Novas Vargas,* and *José L. Novas Dueño* for appellant. *J. B. Fernández Badillo, Solicitor General,* and *Américo Serra, Acting Solicitor General,* for The People.

MR. JUSTICE PÉREZ PIMENTEL delivered the opinion of the Court.

Appellant was found guilty by a jury of a crime against nature and sentenced to serve from 3 to 10 years in the penitentiary.

In this appeal he assigns the commission of several errors, among them insufficiency of the evidence to support his conviction, and erroneous instructions to the jury as to the probative scope of the testimony of the policeman, Jesús M. Aponte.

The oral evidence for the prosecution consisted of the testimony of Octavia Carrasquillo, of the policeman, Jesús M. Aponte, and of the prejudiced minor, Saúl Cotto Carrasquillo.

The Solicitor General summarizes correctly said evidence in the following manner:

"Octavia Carrasquillo testified, in synthesis, that Saúl Cotto Carrasquillo is her son and that he is thirteen years old; that defendant went to her home on February 23, 1964, but that prior to February 21 she did not know defendant; that prior to February 21 her son Saúl left the house with a small brother to take some parcels to the post office; that two days later the defendant went to her house to request her permission to let Saúl go to work at his house for $60 a month; that she told him no because Saúl was under treatment since he had attended school for seven years and did not learn anything; that she told defendant not to 'bribe' her son away because he is under treatment and because prior thereto her son had already told her what the defendant had done to him two days before; that on February 21, 1964 Saúl did not come home and she started missing him; that about twelve o'clock she went to the police station to inform that her son was missing and that some days before a man had come to her house and had 'bribed' him away to work for him; that she did not tell the police defendant's name but she did inform the number of the license plate of the car in which the defendant had gone to her house; that she saw Saúl again six days later when the police brought him; that she then asked him where he had been and the boy told her: 'the man who came here to offer money took me away . . .' (Tr. Ev., pp. 91–103). The court did not permit her to continue testifying about what her son told her upon returning home. See Tr. Ev., pp. 103–106.

"Jesús M. Aponte testified, insofar as pertinent, that he is a state policeman in Puerto Rico; that on February 21, 1964, at

1:45 p.m., the woman, Octavia Cotto Carrasquillo appeared at the Police Station of Hato Rey to report that her son was missing; that afterwards she obtained the number of the license plate of a vehicle and that through the Department of Public Works he found out the same day, February 21, that the vehicle belonged to the defendant. (Tr. Ev., pp. 118–123, 139.) He continued saying that together with Lieutenant Gualberto Torres he took steps to find the defendant, who lived at 1315 Damasco Street in Puerto Nuevo; that on February 26 he remained near defendant's residence and began asking whether it was true that the defendant lived there and the neighbors told him that he did; that about 9:05 in the evening of that day, February 26 he saw that defendant arrived at the house with the boy Saúl Cotto; that since they (the police) had a warrant of arrest they knocked at the door of the house; that defendant put his head out of a window and then they informed him as to the warrant of arrest against him and ordered him to open the door; that when he opened the door they proceeded to arrest him and at that moment the boy, Saúl Cotto—who was behind the door— approached them and held their hands and told them 'thank you, thank you'; that after taking him outside the boy told them that the defendant 'had had sexual relations with him, that he had to lie down, that the boy was afraid of him, that the defendant told him that they killed children around there and that then the names appeared in the newspaper'; that the boy told him that the defendant gave him sandwiches and juices, that 'in the afternoon and at night he [the defendant] introduced his member in the rectum' and that in the afternoon and at night the defendant 'took him and carried him to the bed and introduced his member in the rectum after he lay on top of him and it hurt him, that he could not . . .' (Tr. Ev., pp. 139–145). Policeman Aponte testified, further, that the boy, Saúl told him that defendant had had those sexual relations with him in his residence at 1315 Damasco Street. (Tr. Ev., p. 150.)

"On cross-examination policeman Aponte said, insofar as pertinent, that on the night of February 26, 1964 he saw when defendant entered into his residence accompanied by the boy Saúl Cotto, that when defendant opened the door the boy came out and said 'thank you, thank you,' holding his hand, that then he (the witness) took the boy outside and asked him what was the matter and what was he doing in there, and then and there

the boy related what had happened to him; that meanwhile the defendant was near the police patrol waiting for the patrol to take him away; that the boy told him 'that he was afraid, that he did not want to tell exactly what had happened to him because he believed that we were going to imprison him,' but that nevertheless he related all the occurrence; that the boy told him that the defendant had taken him to a place where music lessons were offered that he (the boy) 'did not dare to go away because he did not know very well the way to reach his home,' 'he did not know how to go alone from there'; that he kept talking with the boy about twenty-five minutes while they waited for the patrol and that he also told him that the defendant had gone to his mother's house to ask her permission to let the boy go to his house to work and to clean the car. (Tr. Ev., pp. 183–191.)

"Saúl Cotto Carrasquillo testified that he is thirteen years old; that about the month of February 1964 he lived with his mother and went to live with defendant in Puerto Nuevo because 'I was afraid because my mother was going to take me to the Juvenile and I went with him'; that he is 'retarded' and that he attended school for seven years; that the defendant did not do anything to him and that 'I was nervous for that reason I said that, because I did not dare tell that he had done that to me.' (Tr. Ev., pp. 193–196.) He admitted that what he was testifying was not what he had told the prosecuting attorney at his office; that he had told the prosecuting attorney that the defendant had done 'evil things in the rectum, but it was that I was nervous and said that'; that that morning he had told the prosecuting attorney at his office that the defendant had committed 'immoral acts with his member in his rectum,' and that he had stayed for six days at defendant's house; that at the end of the six days the police went to look for him and that what he told the policeman who went for him about what the defendant had done to him was a lie. (Tr. Ev., pp. 197–199.) Later, this witness said that the defendant made 'attempts to commit immoral acts but didn't do anything.' (Tr. Ev., p. 204.) Upon being cross-examined by the prosecuting attorney he testified as follows:

'Prosecuting Attorney:

Q. He made attempts to commit immoral acts?

A. Yes.

Q. What attempts to commit immoral acts did he make?

A. Introducing his member in my rectum.

Q. He introduced his member where?

A. In the rectum.

Q. Was that the attempt to commit immoral act he made?

A. Yes, sir.

Pr. A. Then, nothing more, your honor.' (Tr. Ev., p. 204.)

"And upon being cross-examined by the presiding judge and the prosecuting attorney he said the following:

'Judge:

Q. Explain to the ladies and gentlemen of the jury what were the attempts to commit immoral act, what were they?

A. Introducing his member in the rectum.

.    .    .    .    .    .    .    .

Judge:

Therefore, I ask now the minor and you may enter objection if you wish, I ask the minor that those attempts to commit immoral acts when did they occur, or what were they, if in effect he committed them on some occasion, when was it that he made attempts to commit immoral acts to you?

A. When I was doing the work, he called me.

Q. When I was doing what?

A. When he had me there.

Q. Where?

A. In the house. He didn't do anything to me, he took me to the beach, he bought me juices and everything.

Q. The attempts to commit immoral acts what were they?

A. Attempting to do that, but he didn't do anything.

Q. That is, attempting to do something to you, but he did not do anything, but that attempt, what did he introduce, what did he do?

A. I don't understand what you say.

Q. You say attempts. Attempts to give you a blow, or is it not that, like when one closes the fist like this, that is attempt. What was the attempt he made? How did he do it or what did he do?

A. Well, that he attempted to throw himself upon me but did not do it.

Q. He attempted to throw himself upon you . . . . ?

A. But he didn't do anything.

Q. And what is that, attempting to throw himself on you? What did he do? I want you to explain how did he attempt to throw himself upon you?

Prosecuting Attorney:

Does the Court allow me?

Judge:

Of course.

Prosecuting Attorney:

How did he attempt to throw himself upon you, how was it?

A. Like the dogs throw themselves upon "those things" . . .

Judge:

Q. Like the dogs throw themselves upon what?

A. Upon female dogs.

Prosecuting Attorney:

But what did he do with his clothes or with himself, in order to do what you say he did, attempts to commit immoral acts?

A. He was with his clothes on.

Q. Did he take his clothes off?

A. No.

Mr. López Carrillo:

The answer was in the opposite way.

Judge:

That he did not take his clothes off.

Prosecuting Attorney:

Q. He did not take his clothes off. What did he do?

A. Nothing more.

Q. And you, did you take your clothes off?

A. No.

Q. What immoral acts did he commit?

A. Nothing more, he made attempts, what I told you.

Q. How were the attempts?

A. Like a dog does to a female dog.

Q. What does a dog do to a female dog?

A. Jumps upon it.

Q. Where did he throw himself upon you?

A. On the side.

Q. Ah?

A. On the side.

Q. By what side?

A. Thus, on the side, by here.

Q. But he threw himself by your side how, facing you, in front of you?

A. Yes.

Q. Or behind you?

A. On the side, he threw himself upon me like this, on the side.

Q. And what did he do to you? A little while ago when I asked you what immoral acts did he do to you, you said something, that the immoral act he did to you was to introduce his member in your rectum, ah?

A. I was nervous and said that.' (Tr. Ev., pp. 204, 205–208.)

"The witness admitted that he had told his mother, the policeman, and prosecuting attorneys that the defendant had 'introduced his member in his rectum.' (Tr. Ev., p. 210.)

"After the testimony given by him before the prosecuting attorney was read to him, the boy, Saúl Cotto continued testifying that he met the defendant the day he went to his house to wash the car; that the defendant gave him money, candy, and other things; that he also took him to the beach and to hear music; that he lived for six days with the defendant in his house and slept in the same bed with the defendant; that the defendant slept 'upward, over there' and I 'downward over here' in the same bed; that he lied to the policeman because 'that came out of his mouth.' (Tr. Ev., pp. 224–231.)" (Report of the Solicitor General, pp. 4 to 11.)

■■ The statements made by the minor, Saúl Cotto Carrasquillo, to policeman Aponte were correctly admitted in evidence as part of the *res gestae*. Those statements were spontaneous and comply with the requirements of (1) an occurrence sufficiently startling to produce a spontaneous and unreflecting statement; (2) absence of time to fabricate; and (3) the statement relates to the circumstances of the occurrence. *People* v. *Cortés*, 86 P.R.R. 208 (1962); VI Wig-

more, On Evidence § 1750, 3d ed. The fact that the minor made the statements to the policeman after the latter asked him what had happened to him does not lessen the spontaneity of said statements in view of the fact that the minor was still under the influence of the startling occurrence. *People v. González*, 66 P.R.R. 193 (1946); 1 Wharton, Criminal Evidence 633, § 280, 12th ed.

■ Once said utterances are admitted in evidence, the same may be taken as trustworthy and may be received as testimony to the facts concerned. *People v. Cortés, supra*, VI Wigmore, *op. cit.* 135, § 1747.

From the witness stand the prejudiced minor denied that the statements he made to policeman Aponte were true. The prosecuting attorney challenged his testimony on the grounds of prior contradictory statements. A conflict in the evidence was thus created and the judge correctly permitted the jury to settle the conflict despite appellant's objection.

In relation to the statements made by the minor to policeman Aponte, the judge transmitted the following instruction to the jury:

"The evidence, I repeat, which you have to analyze, to consider, is the evidence offered here, Saúl's, what Saúl said, what Aponte said, what Doña Octavia said, and the documentary evidence.

"As I told you before, ladies and gentlemen of the jury, since evidence of corroboration of Saúl's testimony is not required, the testimony of Manuel Aponte, policeman Aponte, if you give it entire credit, would be sufficient at law to establish a case, if you believe it, if you give credit to Manuel Aponte's testimony. You are going to decide that. That is to say, that you are triers of fact, you are the ones to decide how much credit does Manuel Aponte's testimony deserve or whether or not it deserves full credit, and whether from that testimony of Manuel Aponte, according to your judgment, all the elements of the crime would emerge, as the penetration, however slight it might have been and defendant's relation to that penetration, together with the rest of the evidence you might have before you, if you believe

thus that a case of the infamous crime against nature, or attempt against nature, or assault and battery has been proved, depending upon the credit you give to all the testimony considered jointly." (Tr. Ev., pp. 363-4.)

█ This instruction is erroneous and injured greatly the rights of the defendant to be tried according to due process in a fair and impartial trial. If the jury gave entire credit to policeman Aponte's testimony, then such testimony, according to the instruction, was sufficient at law to establish a case. It is tantamount to saying that defendant's guilt was proved if policeman Aponte's testimony deserved entire credit. There is no ground in the record for the jury to deny credibility to policeman Aponte. This police officer was the one who executed the warrant of arrest against defendant, finding him at home with the prejudiced minor. The latter admitted, while testifying at the trial as witness for the prosecution that he made the statements to said policeman although he denied that the content of such statements were true. On the other hand, the defendant introduced no evidence in his defense for which reason, we repeat, there is nothing to question the truthfulness of the policeman's testimony. The doubt which might appear was as to the certainty of the facts related by the minor to the policeman, inasmuch as the former had denied its truthfulness. The policeman, however, could not testify as to the truthfulness of the facts related by the minor because he did not have personal knowledge of what occurred to the minor with the defendant. The truthfulness of the facts related was what was in controversy once the minor denied them. Therefore, to charge the jury that if the policeman's testimony deserved entire credit, the case against defendant was proved, was a prejudicial error.

The Solicitor General maintains that appellant has picked out from the instructions the above-copied statements of the judge in order to seek to argue an error on appeal and copies

other instructions as to the evidence to challenge the minor's testimony.

These instructions which preceded the one challenged are as follows:

"Here, ladies and gentlemen of the jury, the prosecuting attorney has presented evidence seeking to challenge the truthfulness of his witness, Saúl Cotto Carrasquillo.

"Generally, a party who presents a witness, is not allowed, at law, is not permitted at law, to challenge his own witness.

"As an exception it is permitted by law, and when a witness of a party is hostile or antagonistic or surprises such party, in other words, at the witness stand, the party presenting him is entitled to challenge the truthfulness of that witness.

"The court permitted here the prosecuting attorney to present evidence seeking to challenge the truthfulness of Saúl Cotto Carrasquillo, because it believed that his testimony, Saúl's, surprised the prosecuting attorney and was antagonistic to the prosecuting attorney's theory.

"Now then. You are going to consider the evidence introduced by the prosecuting attorney to challenge the truthfulness, in order to determine the credibility which you think Saúl Cotto Carrasquillo deserves.

"That is to say you are not going to decide this case for what Saúl Cotto told the prosecuting attorney the morning . . . as he said that he had told him the morning he interviewed him. That is no evidence. You are not going to decide this case for what Saúl Cotto told the prosecuting attorney when he interviewed him there, no.

"You are going to decide, you are going to consider that in order to determine when, in your opinion, Saúl Cotto tells the truth, when does Saúl Cotto deserve credit, but the evidence which you are going to consider is the one presented here, that of Saúl Cotto, policeman Aponte, and the certificate . . . the mother's, Doña Octavia, and the birth certificate of Saúl. That is the evidence, what they testified here.

"The other, the fact that evidence was adduced that Saúl Cotto had told a fact in such occasion, certain contradictory statement, that was used by the prosecuting attorney in order to show you or to seek to show you that Saúl's testimony here

should not deserve credit, truthfulness, and then you are going to decide whether, after comparing those contradictory statements, whether Saúl deserves credit when he says here that nothing happened to him or whether he deserves no credit when he says here that nothing happened to him. You are going to decide that as a question of credibility." (Tr. Ev., pp. 361 to 363.)

It will be noted that this instruction only indicates to the jury the purpose of the evidence for challenging the minor's testimony, making it clear that that evidence should not be considered by the jury as a proof of the facts charged against the defendant, but as evidence which may affect the minor's credibility. Such instruction does not cure the error subsequently committed in the instruction on the effect of the policeman's testimony, once the latter deserved entire credit.

Since it is a question of a fundamental error which has prejudiced the defendant, the judgment appealed from will be reversed and a new trial will be ordered.

Mr. Justice Belaval agrees with the result. Mr. Justice Dávila, as well as Mr. Chief Justice Negrón Fernández, did not participate herein.